835 A.2d 193

**Edna O. ROURKE, et al.,**

**v.**

**AMCHEM PRODUCTS, INC., et al.**

**No. 1601, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Nov. 4, 2003.

92

David M. Layton (William F. Mulroney, Ashcraft & Gerel, L.L.P., on the brief), Baltimore, for appellant.

Ronald B. Rubin (Michael A. Stodghill, Rubin & Rubin, Chartered on the brief), Rockville (Thomas R. Radcliffe, Jr., DeHay & Elliston, L.L.P., on the brief), Baltimore (Richard M. Wyner, John Mousetakas, Richard L. Matheny, III, Shea & Gardner, on the brief), Washington, DC, for appellee.

Argued before HOLLANDER, JAMES R. EYLER and ADKINS, JJ.

ADKINS, Judge.

In this appeal, a class of asbestos-injured plaintiffs (appellants) question the Circuit Court for Baltimore City's interpretation of a post-settlement communication by appellees, its impact on the arbitration clause in the settlement agreement, and the court's finding that arbitration is the proper forum for

resolution of the underlying dispute. The underlying dispute turns on the issue of whether the Center for Claims Resolution and its Producer Members (appellees) were liable to pay the settlement share agreed to by a co-defendant, who has defaulted, in addition to their own shares. Appellants creatively seek to employ a seldom-seen doctrine of questionable efficacy in Maryland—offensive non-mutual collateral estoppel—to avoid litigating the arbitrability issue. Finally, appellees question whether the issues are ripe for this Court's review.

Specifically, the issues before us, in the order in which we will address them, are:

I. Did the circuit court enter a final judgment on these claims when it ordered the plaintiffs/appellants to binding arbitration with some, but not all, of the defendants/appellees? If not, does this case satisfy any of the exceptions to the Final Judgment Rule?

II. Should this Court apply offensive non-mutual collateral estoppel where the issues were litigated in a foreign jurisdiction?

III. Did the trial court err when it granted appellees' motion to compel arbitration after finding that a letter sent subsequent to formation of the Master Settlement Agreement did not modify the arbitration clause in Paragraph 7 of the MSA?

For the reasons set out below, we hold that jurisdiction is proper in this Court, and offensive non-mutual collateral estoppel is not appropriately employed in this case. We affirm the circuit court's ruling granting the motion to compel arbitration.

## FACTS AND LEGAL PROCEEDINGS

In September 1988, a consortium of asbestos-related claims defendants entered into an agreement, the "Producer Agreement Concerning Center for Claims Resolution" (Producer Agreement), to establish a non-profit, non-stock Delaware corporation, the Center for Claims Resolution (CCR), to act as

a claims handling facility. CCR was organized in October 1988.

On April 20, 2000, 882 plaintiffs having asbestos-related personal injury and wrongful death claims pending in the Circuit Court for Baltimore City entered into a Master Settlement Agreement (MSA) with CCR. It also provided that under the MSA, individual plaintiffs receive monetary payments in consideration for executing releases relinquishing their right to bring tort claims against CCR members. Each plaintiff receiving more than the smallest settlement amount would receive a specified lump-sum amount in three unequal installments. Plaintiffs entitled to the smallest settlement amount would be paid in full from the first CCR installment check. The M.S.A. specified that the first payment of $4,500,000.00 be made on July 1, 2000; a second payment of $4,000,000.00 be made on June 1, 2001; and a third payment of any and all remaining amounts on September 1, 2002. Under the agreement, "**each CCR member company shall be liable ... only for its individual share of such payments[.]**" (Emphasis added.) If any company failed to pay its share, appellants had the opportunity to either (i) void the settlement in its entirety, or (ii) pursue the defaulting company based on its original tort claim. The agreement called for resolution of "**any disputes that may arise while carrying out the terms and conditions of this Agreement**" through a process of **binding arbitration.** (Emphasis added.)

On October 5, 2000, CCR tendered a check for $3,822,501.41 as payment in full of the first installment. CCR explained that the amount represented the $4.5 million due, less the amount owed by a defaulting Producer Member, Asbestos Claims Management Corporation (ACMC). ACMC filed for protection under federal bankruptcy laws in June 2000, and its membership in CCR was consequently terminated under the terms of the Producer Agreement.

On October 10, 2000, appellants' counsel sent a letter to CCR's chief operating officer, Michael F. Rooney, in which

appellants requested "an accounting as to the ACMC portion of the gross settlement for each ... client." He explained:

The funds will be distributed as clients ratify the CCR settlement agreement, with the understanding that we will diligently pursue our legal remedies to collect the unpaid balance of the settlement. In those situations where individual clients elect to "opt out" of the settlement because of ACMC's default, the settlement funds will be returned to you.

Rooney responded to appellants by letter dated October 31, 2000 (Rooney letter). This letter said:

Each settling plaintiff will execute a release to the CCR for the full amount of the settlement prior to receiving the first installment; however, it is specifically understood and agreed that these releases are not evidence of full satisfaction of the contractual obligation of the CCR to pay the qualified plaintiffs the settlement values that have been agreed upon, and should the CCR fail to timely make any or all of the payments required by the Master Settlement Agreement, then in that event each settling plaintiff who has not received full payment may pursue a remedy in contract against the CCR members for any deficiency. If such action is required, the CCR members shall be responsible to pay the deficiency with interest at 8% per annum, and the CCR members will reimburse each such settling plaintiff for reasonable attorneys' fees and expenses that may be required to collect this deficiency by lawsuit or otherwise.

This remedy in contract on the release will be the sole legal remedy of each plaintiff who has executed a release for the full consideration of his settlement but fails to receive timely payment in full, with the exception of those plaintiffs who elect to renunciate the settlement because of the ACMC non-payment before accepting the first settlement installment payment.

Appellants contend that the Rooney letter modified the M.S.A. by (1) rendering the appellees jointly and severally

liable for the full settlement amount, including ACMC's share; and (2) granting claimants a right to sue in court to enforce the M.S.A. release agreements against CCR members for any deficiency in payment, thus abandoning the agreement to arbitrate "any disputes" set forth in the MSA.

On March 7, 2002, appellants filed an action in the Circuit Court for Baltimore City against CCR and twelve named Producer Members of CCR, seeking declaratory relief and specific performance to enforce payment of the deficiency amount. Appellees removed the action to the United States District Court for the District of Maryland, which subsequently remanded the case back to the circuit court. On April 5, 2002, appellees moved to compel arbitration between appellants and the twelve remaining Producer Members, and then to dismiss the action against CCR under Md. Rule 2–322(b)(2). After a hearing, the circuit court ruled that the Rooney letter did not modify the arbitration clause of the MSA. The court then granted the Motion to Compel Arbitration and stayed all proceedings involving issues subject to arbitration.

Appellants appealed the trial court's Order to Compel Arbitration to this Court. CCR filed a Motion to Dismiss the Appeal on the ground that the order staying appellants' claim against CCR did not certify the case for interlocutory appeal, and did not otherwise constitute a final, appealable judgment. This Court denied that motion without prejudice to the jurisdictional issues raised.

## · DISCUSSION

## I.

### Appellate Jurisdiction

Appellees argue that this Court lacks appellate jurisdiction because the circuit court's order does not dispose of all claims against all parties and, consequently, it is not a final judgment from which appeal may be taken. When the trial court granted appellees' motion to compel arbitration, it stayed the motion to dismiss the claim against CCR. Appellees, therefore,

contend that the order to arbitrate is not an appealable final judgment because the claim against CCR remains before the trial court.

Additionally, appellees posit that appellate review under the collateral order doctrine is inapplicable because the trial court's order compelling arbitration is closely linked to the merits, and because it is not effectively unreviewable on appeal.

Lastly, appellees argue that this case is not appropriate for certification under Md. Rule 8–602(e) because this Court lacks the benefit of a written decision by the trial court as to why certification is appropriate, because judicial economy and the policy against piecemeal appeals caution against certification, and because appellants have not shown that they will be permanently deprived of appeal rights if they must wait to file an appeal until the claims against CCR are resolved.

In reply, appellants contend that a trial court's decision whether to grant or deny a motion to compel arbitration, or to stay arbitration, is immediately appealable. They cite *Town of Chesapeake Beach v. Pessoa Constr. Co.*, 330 Md. 744, 625 A.2d 1014 (1993), as controlling authority allowing an immediate appeal of an order denying a petition for a stay of arbitration. In this context, appellants argue, an order compelling arbitration is equivalent to, and has the same net effect, as an order denying a petition to stay arbitration. Therefore, *Chesapeake Beach* is on point.

Arguing in the alternative, appellants assert that the order satisfies the criteria for appeal under either the collateral order doctrine or via certification by this Court under Rule 8–602(e)(1)(C). We need not reach these arguments because we hold that the circuit court's grant of appellees' motion to compel arbitration constituted an appealable final judgment.

## A.

### Final Judgment Rule

Generally, a party may appeal only from a final judgment entered in a civil or criminal case by a circuit court. *See*

▬▬▬

Md.Code (1974, 2002 Repl.Vol.) § 12–301 of the Courts & Judicial Proceedings Article (CJ). " 'Final judgment' means a judgment, decree, sentence, order, determination, decision, or other action by a court ... from which an appeal ... may be taken." CJ § 12–101(f). Md. Rule 2–602(a) provides, in pertinent part:

> Except as provided in section (b) of this Rule, an order ... that adjudicates fewer than all of the claims in an action ..., or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action ... is not a final judgment[.]

This straightforward rule of law becomes complicated when the circuit court's order concerns the forum for adjudication rather than the underlying issue. The Court of Appeals explained that "a trial court's order sometimes may constitute a final appealable judgment even though the order fails to settle the underlying dispute between the parties. Where a trial court's order has 'the effect of putting the parties out of court, [it] is a final appealable order.' " *Horsey v. Horsey*, 329 Md. 392, 401, 620 A.2d 305 (1993)(quoting *Houghton v. County Comm'rs of Kent Co.*, 305 Md. 407, 412, 504 A.2d 1145 (1986)). The *Horsey* Court concluded that "[a] circuit court's order to arbitrate the entire dispute before the court does deprive the plaintiff of the means, in that case before the trial court, of enforcing the rights claimed. The order effectively terminates that particular case before the trial court. Thus, the order would clearly seem to be final and appealable[.]" *Id.* at 402, 620 A.2d 305. "Because an order of a circuit court compelling the parties in an action before it to arbitrate the underlying claim completely terminates the action in the circuit court, we have held that an order compelling arbitration is a final judgment and appealable under CJ § 12–301." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 241, 768 A.2d 620 (2001). Critical to the Court's reasoning in *Horsey* and *Wells* was the Court's finding that ordering the parties to arbitrate the underlying issues effectively terminated the action in the circuit court because no issue remained before it.

Three months after *Horsey*, the Court of Appeals decided *Town of Chesapeake Beach v. Pessoa Constr. Co.*, 330 Md. 744, 625 A.2d 1014 (1993). In *Chesapeake Beach*, the Court explained that "[a] petition to stay arbitration proceedings ... may be [brought] as a separate action" and, as such, "[t]he relief sought by the moving party ... does not bear on the merits of the underlying claim; it relates solely to the forum to be used for the resolution of that dispute." *Id.* at 751, 625 A.2d 1014. The Court reasoned that, once the circuit court resolved the dispute over appropriate forum, that decision was final and appealable. *See id.* The Court explained that, although the petition in that case was filed during the course of litigation, it could have been brought as a separate action. *See id.* Review of the petition by the trial court is separate and distinct from the underlying claim. The Court, therefore, may certify the order as a final judgment even though it did not finally dispose of all claims in the action in which it was filed. *See id.* at 752–53, 625 A.2d 1014.

*Chesapeake Beach* concerned the appeal of a circuit court's **denial** of a motion to **stay** arbitration. In the case at bar, we are concerned with the circuit court's **grant** of a motion to **compel** arbitration. Appellants argue that, contextually, the issues are identical. We agree. In both cases, the salient factual scenario is that the trial court ordered the parties to arbitrate against the wishes of one party.

█ In this case, appellees argue that the trial court's grant of the order to compel arbitration did not constitute a final judgment because the court simultaneously stayed "all proceedings involving issues subject to arbitration," including the motion to dismiss. Under *Chesapeake Beach*, however, we view the motion to compel arbitration as separate and distinct from appellants' prayers for declaratory relief and specific performance.

█ The Court of Appeals has long held that the denial by a trial court of a party's ability to pursue claims before it is an immediately appealable final order. In *Brewster v. Woodha-*

*ven Bldg. & Dev., Inc.,* 360 Md. 602, 759 A.2d 738 (2000), Judge Raker explained:

> It is well settled that an order need not necessarily dispose of the merits of a case to be a final judgment.... If a judgment does not settle the merits of the case, it must deny the party challenging it the ability to litigate the case in *any* forum, in order to be a final judgment....
>
> Our cases pertaining to this question show that an order is final if it terminates the litigation in a particular court.... Thus, it is well settled that an order denying a party the ability to pursue claims anywhere is an immediately appealable final order....
>
> We have also stated from an early period, however, the more specific proposition that a judgment terminating litigation *in a particular court* is a final judgment.

*Id.* at 610–13, 759 A.2d 738. Judge Raker cited *Horsey* in applying this reasoning to arbitration. "[W]e held that the trial court's order to the parties to submit their dispute to arbitration was an immediately appealable final judgment, even though the parties were thereby afforded the opportunity to pursue their rights before the arbitrator." *Id.* at 614–15, 759 A.2d 738. It is settled in Maryland, therefore, that a circuit court's order removing a claim from that court to another—whether to a district court, another circuit court, or to arbitration—constitutes an immediately appealable final judgment on the arbitrability question.

We recently discussed an action to compel arbitration in *NRT Mid–Atlantic, Inc. v. Innovative Properties, Inc.,* 144 Md.App. 263, 277, 797 A.2d 824 (2002). We found that, under CJ section 3–207, an action to compel arbitration may be prosecuted separately. *See id.* Section 3–207 provides:

> (a) *Refusal to arbitrate.*—If a party to an arbitration agreement ... refuses to arbitrate, the other party may file a petition with a court to order arbitration.
>
> (b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration agree-

ment, the court shall proceed expeditiously to determine if the agreement exists.

(c) *Determination by court.*—If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

■■■ Therefore, "a petition to compel arbitration may properly be filed as a free-standing action against the party refusing to submit the dispute to arbitration." *NRT Mid–Atlantic,* 144 Md.App. at 277, 797 A.2d 824; *see Bel Pre Med. Ctr. v. Frederick Contractors, Inc.,* 21 Md.App. 307, 319–20, 320 A.2d 558 (1974). "In that situation, a court's order deciding such an action disposes of the action in its entirety, regardless of whether the order grants or denies the petition.... Accordingly, the court's order is a final judgment[.]" *NRT Mid–Atlantic,* 144 Md.App. at 277, 797 A.2d 824; *see also RTKL Assocs., Inc. v. Baltimore County,* 147 Md.App. 647, 655, 810 A.2d 512 (2002)(trial court's denial of a motion to compel arbitration is a final judgment on that issue). A court's grant or denial of a motion to compel arbitration constitutes a final judgment on the issue of arbitrability even where, as in the instant case, the motion to compel is taken not as a separate action but as part of the litigation process commenced on the underlying claim. *See, e.g., Allstate Ins. Co. v. Stinebaugh,* 374 Md. 631, 636, 824 A.2d 87 (2003)(one of two insurance companies in personal injury action that cross-claimed on respective liability moved to compel arbitration); *Wells,* 363 Md. at 241, 768 A.2d 620 (circuit court grant of defendant's motion to compel arbitration in an action alleging breach of contract is a final judgment); *NRT Mid–Atlantic,* 144 Md.App. at 272–79, 797 A.2d 824 (defendant filed motion to compel in action involving contract and tort claims).

We hold that the court's order to compel arbitration constituted a final appealable judgment on the question of whether the issues raised in appellants' suit for declaratory relief were arbitrable.

## II.

### Offensive Non-mutual Collateral Estoppel

Appellants argue that appellees should be collaterally estopped from relitigating their motion to compel arbitration. They contend that the issue of arbitrability already litigated in *Amchem Prods., Inc. v. Newport News Circuit Court Asbestos Cases Plaintiffs*, 264 Va. 89, 563 S.E.2d 739 (2002), should not be subject to relitigation now.

In *Amchem*, the Supreme Court of Virginia conducted a *de novo* review of the M.S.A. arbitration clause and the Virginia version of the Rooney letter. The Court found that there was no "legally cognizable dispute" requiring submission to an arbitrator before affirming the trial court's denial of CCR's motion to compel arbitration. *See id.* at 745.

To support their argument for collateral estoppel, appellants point to: the nearly identical language of the Virginia and Maryland versions of the respective MSAs and Rooney letters; that CCR was motivated to,[1] and did in fact, fully litigate the issue of whether the parties were required to arbitrate the joint and several liability of CCR members for the debts of defaulting members; and, that the Circuit Court for Newport News' decision, as affirmed by the Supreme Court of Virginia, is a final judgment on that issue. Consequently, appellants argue, CCR should be precluded from relitigating the arbitrability of the joint and several liability issue.

Arguing for affirmation of the circuit court's decision not to give preclusive effect to *Amchem*, appellees rely on Maryland statutory and federal case law confining judicial review to deciding whether an agreement to arbitrate exists.[2] Addition-

---

1. Appellants point to the amount in controversy ($13,659,600.00) in the *Amchem* case as indicative of the CCR defendants' motivation to litigate.

2. "An order for arbitration shall not be refused ... [o]n the ground that the claim in issue *lacks merit or bona fides.*" Md.Code (1974, 2002 Repl.Vol.), § 3–210 of the Courts & Judicial Proceedings Article (CJ); *see also AT & T Techs., Inc. v. Communications Workers of Am.*, 475

ally, appellees point to differences between the two cases as reasons why they should not be collaterally estopped on the arbitrability issue in this case. In particular, the Rooney letter in *Amchem* abolished the option to void the settlement while the Rooney letter here did not. Secondly, the Rooney letter here was written in response to appellant counsel's letter of October 23, 2000. Appellees contend that these differences are material and preclude application of collateral estoppel.

Appellees next argue that offensive non-mutual collateral estoppel has not been adopted by Maryland courts, and should not be allowed in this case. They further argue that, in those jurisdictions where it is presently accepted, trial courts are given broad discretion to determine whether to allow it.[3]

Although the offensive use of non-mutual collateral estoppel has not previously been employed in Maryland, appellants contend that the doctrine is appropriate to the facts and circumstances of this case. They argue that Maryland courts must give full faith and credit to the Virginia courts' decisions. To do this, we must determine both that collateral estoppel is appropriate to the issue in question and that Virginia courts would so find it to be. *See Jessica G. v. Hector M.*, 337 Md. 388, 404–05, 653 A.2d 922 (1995).

Collateral estoppel, or issue preclusion, originated as a common law doctrine. *See Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 387, 761 A.2d 899 (2000). "A common and well-established articulation of the doctrine is that '[w]hen an issue of fact or law is actually litigated and

U.S. 643, 649–50, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986)("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims").

3. *See Sales v. Grant*, 158 F.3d 768, 780 (4th Cir.1998)(citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979)(use of offensive non-mutual collateral estoppel "is committed, because of its particular possibilities for inequity, to 'broad' trial court discretion")).

determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.' " *Id.* (quoting *Murray Int'l v. Graham*, 315 Md. 543, 547, 555 A.2d 502 (1989), quoting from RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)). "Collateral estoppel is not concerned with the legal consequences of a judgment, but only with the findings of ultimate fact, when they can be discovered, that necessarily lay behind that judgment." *Id.* at 391, 761 A.2d 899.

Non-mutual collateral estoppel is used when a new party seeks to prevent the relitigation of an issue of fact or law that was previously determined in a "full and fair" adjudication involving the opposing party. *See Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 517, 555 A.2d 486 (1989).

The United States Supreme Court addressed offensive non-mutual collateral estoppel in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The case concerned a stockholder class action claim alleging that corporate officers had issued a materially false proxy statement in violation of the Securities Exchange Act of 1934. *See Parklane*, 439 U.S. at 324, 99 S.Ct. at 648. While the class action was awaiting trial, the Securities and Exchange Commission filed suit seeking injunctive relief against the same defendants in federal district court. *See id.*, 439 U.S. at 325, 99 S.Ct. at 648. The district court found that the proxy statement was materially false and misleading and entered a declaratory judgment against the defendants. *See id.* The Court of Appeals for the Second Circuit affirmed.

The class action plaintiffs then moved for partial summary judgment. *See id.* They argued that the defendants should be collaterally estopped from relitigating the issues that had been resolved against them in the SEC action. *See id.* The district court denied the motion. *See id.* The Court of Appeals for the Second Circuit reversed, holding that a party should be collaterally estopped from relitigating issues of fact that had been determined against him after a full and fair

opportunity to litigate. *See id.* The Supreme Court affirmed. *See id.,* 439 U.S. at 337, 99 S.Ct. at 655.

The question before the Court was "whether a litigant who was not a party to a prior judgment may nevertheless use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." *Id.,* 439 U.S. at 326, 99 S.Ct. at 655. This "non-mutual" use of collateral estoppel represented a shift away from the traditional requirement for mutuality. *See id.* The Court explained the rationale for abrogating the mutuality requirement:

> Under this mutuality doctrine, neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment. . . . [T]he mutuality requirement provided the party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties.
>
> By failing to recognize the obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost, the mutuality requirement was criticized almost from its inception. Recognizing the validity of this criticism, the Court ... abandoned the mutuality requirement[.]

*Id.,* 439 U.S. at 326–27, 99 S.Ct. at 649–50 (footnote omitted).

The *Parklane* Court recognized that collateral estoppel provided dual benefits: protecting litigants from the burden of relitigating an identical issue with the same party, and promoting judicial economy. *See id.,* 439 U.S. at 326, 99 S.Ct. at 649. The Court noted, however, that an important safeguard was that a party against whom an estoppel is asserted must have had "a full and fair opportunity to litigate." *Id.,* 439 U.S. at 328, 99 S.Ct. at 650.

The Supreme Court forewarned that offensive use of collateral estoppel may have negative effects. It may result in increased litigation because plaintiffs, who will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, may adopt a "wait and see" approach and not file claims until after a

defendant has lost a present case. *See id.* 439 U.S. at 330, 99 S.Ct. at 651. "[P]otential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action." *Id.*

The Court then cautioned that offensive collateral estoppel may be unfair to a defendant in certain circumstances, including when: in the first action, the claim was for damages too small to motivate the defendant to litigate vigorously; the judgment relied upon as a basis for the estoppel is itself inconsistent with previous judgments in favor of the defendant; and, where the second action affords the defendant procedural opportunities unavailable in the first action and those remedies could result in a different outcome. *See id.,* 439 U.S. at 330–31, 99 S.Ct. at 651.

Although offensive non-mutual collateral estoppel has not been formally adopted in Maryland, the Court of Appeals has indicated that it may be employed under proper circumstances.

In *Welsh v. Gerber Prods., Inc.,* 315 Md. 510, 555 A.2d 486 (1989), the Court addressed non-mutual *defensive* collateral estoppel in a case certified to it by the United States Court of Appeals for the Fourth Circuit. Considering *offensive* non-mutual collateral estoppel in *dicta,* the Court explained that "[o]ffensive use of non-mutual collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party." *Id.* at 518 n. 6, 555 A.2d 486 (citing *United States v. Mendoza,* 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 571 n. 4, 78 L.Ed.2d 379 (1984)). Non-mutual collateral estoppel is, the Court observed, "almost as simple in concept as it is difficult in application." *Id.* at 517, 555 A.2d 486.

The *Welsh* Court recognized that offensive use of non-mutual collateral estoppel would be "manifestly unfair" in many situations. *See id.* It nevertheless admitted that, "[c]onceptually, there will be instances in which a party who has had the benefit of a full and fair adjudication of an issue

should be bound by that adjudication, even in a subsequent proceeding involving a different party." *Id.*

■ The Court of Appeals has allowed Bar Counsel to use offensive non-mutual collateral estoppel in cases of attorney misconduct.[4] Disciplinary proceedings are not, however, actions at law. *Anne Arundel County Bar Ass'n v. Collins,* 272 Md. 578, 582, 325 A.2d 724 (1974). "[A] disciplinary proceeding is neither an action at law, nor a criminal prosecution." [5] *Id.* (citations omitted). Consequently, Bar Counsel's employment of offensive non-mutual collateral estoppel does not constitute precedent for its use here.

■ Bearing in mind that in *Welsh* the Court of Appeals suggested that non-mutual collateral estoppel may be applied in some situations in Maryland, for the reasons that follow, we nonetheless find use of the doctrine inappropriate to the circumstances of this case.

■ To analyze whether offensive non-mutual collateral estoppel may be employed here, we must first determine if issue preclusion in general is appropriate. In *Washington Suburban Sanitary Comm'n v. TKU Assocs.,* 281 Md. 1, 376 A.2d 505 (1977), the Court approved a four-part test that must

---

4. *See, e.g., Att'y Grievance Comm'n v. Dechowitz,* 358 Md. 184, 190, 747 A.2d 657 (2000)(final judgment convicting respondent of possession with intent to distribute marijuana was conclusive evidence of misconduct); *Att'y Grievance Comm'n v. Sabghir,* 350 Md. 67, 80, 710 A.2d 926 (1998)(disbarment by New York State Court of Appeals is a final adjudication in a disciplinary proceeding and conclusively establishes misconduct); *see also* Md. Rule 16-771(g) (2003)(a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime shall be conclusive proof of the guilt of the attorney of that crime).

5. The Court explained:
 The action of a court in exercising its power to disbar or suspend an attorney is judicial in character, but the inquiry is in the nature of an investigation by the court into the conduct of one of its own officers, and is not the trial of an action at law, as the order which is entered is only an exercise of the disciplinary jurisdiction which a court has over its officers . . .
 *Collins,* 272 Md. at 582–83, 325 A.2d 724.

be satisfied in order to apply the doctrine of collateral estoppel:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Id.* at 18–19, 376 A.2d 505. When collateral estoppel is employed non-mutually, courts have placed increased emphasis on the need to assure that the issue in question was fully litigated in the previous action. "The foundation of the rule of non-mutual collateral estoppel is that the party to be bound must have had a full and fair opportunity to litigate the issues in question." *Welsh,* 315 Md. at 518, 555 A.2d 486.

In *Amchem,* the Supreme Court of Virginia considered an interlocutory appeal of the circuit court's denial of a motion to compel arbitration. The plaintiffs/appellees were 597 individuals who were themselves injured by exposure to asbestos, or the personal representatives of deceased persons injured by asbestos. *See Amchem,* 563 S.E.2d at 740. The defendants/appellants were producer members of CCR. *See id.* The facts of the case closely resemble the facts here.

The appellees entered into a Master Settlement Agreement with CCR and its members in July 2000. *See id.* CCR members agreed to pay an amount specified in the M.S.A. to each plaintiff in consideration for the plaintiff's signed release of liability. *See id.* at 740–41. Before the first payment was due, two CCR members, Asbestos Claims Management Corporation and Armstrong World Industries, Inc., defaulted on their obligations to pay their share of the payments. *See id.* at 741. CCR sent plaintiffs' attorneys a check for the amount due, less the amounts owed by the two defaulting members. *See id.* Plaintiffs filed suit to enforce the M.S.A. in the circuit court. *See id.* at 742. They asserted that individual CCR members are jointly and severally liable for the payments due

under the MSA. *See id.* CCR and its members moved to compel arbitration. *See id.* The circuit court denied the motion and the defendants filed an interlocutory appeal from that order. *See id.*

The Supreme Court of Virginia "conclude[d] with positive assurance that no legally cognizable dispute exists that would subject the litigants to arbitration and, thus, there is nothing for an arbitrator to decide." *Id.* at 745. The Court affirmed the circuit court's order denying the motion to compel arbitration and remanded the case to the circuit court "so the plaintiffs may pursue their contract remedies." *Id.*

Appellants contend that *Amchem* addressed the issue in question here: whether the Rooney letter modified the parties' agreement to arbitrate disputes when the disputed issue is the proper forum to resolve the question of joint and several liability of producer members. Appellees present numerous arguments why relitigation of the arbitrability issue should not be precluded. We address the two arguments they present that we find pertinent to this case: the effect of conflicting opinions and the proper application of Full Faith and Credit.

### A.

### Conflicting Prior Opinions

In correspondence submitted after filing its brief to this Court, appellees point to *Cales v. Armstrong World Indus., Inc.*, 2003 Ohio 1776, 2003 WL 1798671, 2003 Ohio App. LEXIS 1692 (Ohio Ct.App.2003), in which the court addressed the same underlying issue as *Amchem*, but reached the opposite decision. *Cales*, like this case and *Amchem*, concerned the arbitrability of a dispute between asbestos-injured plaintiffs and CCR over the issue of joint and several liability of CCR Producer Members for the debts of previous members. The appellate court reversed the trial court, holding that the Settlement Agreement unambiguously required arbitration of all disputes. Appellees contend that the divergent decisions in *Amchem* and *Cales* render collateral estoppel unusable.

RESTATEMENT (SECOND) JUDGMENTS § 29 provides an exception to collateral estoppel for cases in which prior judgments conflict. It reads, in pertinent part:

§ 29 Issue Preclusion in Subsequent Litigation with Others

A party precluded from relitigating an issue with an opposing party ... is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue. The circumstances to which considerations should be given include ... whether: ... (4) The determination relied on as preclusive was itself inconsistent with another determination of the same issue.

We distinguish *Cales*, however, because that case concerned the interpretation of the arbitration clause of the Settlement Agreement. There was no "Rooney letter" that purportedly modified the Settlement Agreement as we have here and in *Amchem*. We find that difference material. We conclude, therefore, that relitigation of the issue is not supported by the exception to collateral estoppel provided by Section 29(4) of RESTATEMENT (SECOND) OF JUDGMENTS.

## B.

## Full Faith And Credit

 Of greater impact to this case is our duty to afford the *Amchem* holding the same preclusive effect it would have in Virginia. "Under the Maryland law of conflict of laws, the *res judicata* effect to be given to the judgment of a court of a foreign state is the *res judicata* effect that that judgment has in the state where the judgment was rendered." *Jessica G. v. Hector M.*, 337 Md. 388, 404, 653 A.2d 922 (1995); *see, e.g., Small v. Ciao Stables, Inc.*, 289 Md. 554, 560, 425 A.2d 1030 (1981)(New York law applied to determine whether a judgment entered by a New York court had preclusive effect in a Maryland contract action). *See also* 28 U.S.C. § 1738 (2003)(Full Faith and Credit commands only that judicial proceedings in one state "shall have the same full faith and

credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken"). We look, therefore, to Virginia law to determine the preclusive effect of *Amchem.*

The Supreme Court of Virginia addressed offensive non-mutual collateral estoppel in *Norfolk & W. Ry. Co. v. Bailey Lumber Co.,* 221 Va. 638, 272 S.E.2d 217 (1980). The case involved negligence claims arising from the collision of a railway locomotive with a gasoline tanker truck. *See id.* at 218. Multiple claims were filed against the railroad, including a wrongful death action brought by the personal representative of a bystander killed by the resulting explosion. *See id.* Following a finding of negligence against the railroad and trucking company in the wrongful death claim, a second claimant filed suit and, along with the trucking company, sought to preclude relitigation of the railroad's negligence. *See id.* The Virginia Supreme Court held that collateral estoppel requires mutuality, "especially when the estoppel is used 'offensively.' " *Id.* at 219 (citations omitted). The Court explained:

> The principle of mutuality ... serves to keep the influence of the initial adjudication within proper bounds by requiring that to be effective the estoppel of the judgment must be mutual. Thus, according to the principle of mutuality, to which there are exceptions, a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result.

*Id.* at 218 (citations omitted). The Court reasoned that mutuality is needed to prevent injustice in cases in which offensive collateral estoppel is employed in one of a series of claims arising from a common event.[6] *See id.* at 220. Virginia continues to require mutuality of parties when issue preclusion is invoked. *See TransDulles Ctr., Inc. v. Sharma,* 252 Va. 20,

---

6. The Court cited the following example as illustrative:

In a bus collision, 50 injured passengers bring separate suits against the bus company. The defendant wins the first 25 suits, but a plaintiff wins suit 26. The offensive use of collateral estoppel should

472 S.E.2d 274, 275 (1996); *Glasco v. Ballard,* 249 Va. 61, 452 S.E.2d 854, 855 (1995).

Although Maryland may not require mutuality of parties in actions invoking collateral estoppel, Virginia does. Full Faith and Credit commands that we apply Virginia law to determine the preclusive effect of the *Amchem* decision. Virginia would not permit appellants to invoke collateral estoppel in order to prevent appellees from relitigating the arbitrability of the dispute over the liability of CCR's Producer Members for the debts of former members. We, therefore, decline appellants' invitation to give the Virginia decision greater effect than it would have in that state.

## III.

### The Arbitration Clause

Appellants argue that the trial court erred by not recognizing the modifying effect that the October 31, 2000 Rooney letter had on the M.S.A. arbitration clause. They contend that the Rooney letter constituted a modification of the MSA. Had the trial court applied ordinary principles and rules governing the interpretation of contracts, they argue, it would have found that the arbitration language of the M.S.A. was intended only to resolve individual claimants' disputes regarding the processing of their claims. Additionally, they argue, the court would have found that the Rooney letter modified the MSA, granting appellants a right to sue in court to enforce payment due under the MSA, and avoid their prior agreement to arbitrate any disputes.

### A.

### Choice Of Law

 The Federal Arbitration Act (FAA), *codified at* 9 U.S.C. § 1 *et seq.,* governs agreements to arbitrate between

---

not be applied to permit plaintiffs 27 through 50 automatically to recover.

*Norfolk and W. Ry. Co. v. Bailey Lumber Co.,* 221 Va. 638, 272 S.E.2d 217, 220 (1980).

parties involved in interstate commerce. The United States Supreme Court has interpreted " 'involving commerce' in the FAA as the functional equivalent of . . . 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' *Commerce Clause* power." *The Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, ——, 123 S.Ct. 2037, 2040, 156 L.Ed.2d 46 (2003). The FAA's coverage is broad "[b]ecause the statute provides for 'the enforcement of arbitration agreements within the full reach of the *Commerce Clause*.' " *Id.* It is not limited to transactions "within the flow of interstate commerce." *See id.* What is required is that the economic activity in question represent "a general practice . . . subject to federal control" that bears on interstate commerce in a substantial way. *See id.*

Here, the CCR provider members are national and multinational organizations engaged in commerce that crosses state borders. Additionally, they will draw upon resources from states outside Maryland to make payments due under the MSA. Thus, this case appears to meet the interstate commerce requirement for the applicability of the FAA.

When an agreement's choice of law clause provides that disputes will be resolved in accordance with state law, however, the selected state's arbitration act governs issues concerning arbitration under the agreement's arbitration clause. *See C & L Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 419, 121 S.Ct. 1589, 1594–95, 149 L.Ed.2d 623 (2001). Paragraph 21 of the M.S.A. provides that "disputes concerning the interpretation or performance under th[e][MSA] shall be resolved in accordance with the laws of the State of Maryland." [7] The Maryland Uniform Arbitration Act (MUAA) confers jurisdiction on the courts of this State to enforce agreements to arbitrate under

---

7. The outcome would not be different if we applied the FAA. "The Maryland Arbitration Act has been called the 'State analogue . . . to the Federal Arbitration Act.' " *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 541, 649 A.2d 365 (1994) (citation omitted). Both acts contain the same policy favoring enforcement of arbitration agreements. *See id.*

the laws of Maryland. *See* CJ § 3–202. Consequently, we review this appeal under the MUAA.

## B.

### Determination of Arbitrability

The Court of Appeals recently addressed the courts' role in determining the arbitrability of an issue when, as in this case, it is claimed that an existing agreement to arbitrate is voided by a subsequent agreement between the parties. In *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 824 A.2d 87 (2003), the Court reviewed the rules laid down in *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 104–07, 468 A.2d 91 (1983), for determining whether court or arbitrator determines arbitrability when the question is the scope of the arbitration clause and its applicability to the dispute at hand. *See Stinebaugh*, 374 Md. at 643, 824 A.2d 87. The Court explained:

> First, ... if an arbitration clause is clear, it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause. Second, ... in determining whether a dispute falls within the scope of an arbitration clause, arbitration should be compelled if the arbitration clause is broad and does not "expressly and specifically exclude[ ]" the dispute. Third, ... if an arbitration clause is unclear "as to whether the subject matter of the dispute falls within the scope of the arbitration agreement," the question of arbitrability ordinarily should be left to the arbitrator.

*Id.* (citations omitted).

The Court distinguished *Gold Coast Mall*. *Stinebaugh* concerned two separate agreements while *the Gold Coast Mall* Court found that a single lease agreement contained an arbitration clause that "became unclear when juxtaposed against other clauses in the same lease agreement[.]" [8] *Id.* In *Stine-*

---

8. *Stinebaugh* involved a traffic accident victim's negligence suit against the driver who ran into the car she was in. The two insurance companies defending the suit cross-claimed. The parties reached a

*baugh,* the arbitration agreement contained language that may have required arbitration of the dispute, but the subsequent settlement agreement clearly called for a judicial resolution of the issue. *See id.* at 644, 824 A.2d 87. The Court found that the issue of arbitrability was for the trial court to decide, because the arbitration clause was clearly limited by the settlement agreement. *Id.*

The *Stinebaugh* Court reiterated that "the *Maryland Uniform Arbitration Act* expresses the legislative policy favoring enforcement of agreements to arbitrate." *Id.* at 641, 824 A.2d 87. "Although the law looks with favor upon arbitration as a method of dispute resolution, it does not look with favor upon sending parties to arbitration when there is no agreement to arbitrate." *Town of Chesapeake Beach,* 330 Md. at 757, 625 A.2d 1014. Thus, the existence of an arbitration agreement is a question of contract interpretation. *See NRT Mid–Atlantic, Inc. v. Innovative Props., Inc.,* 144 Md.App. 263, 279, 797 A.2d 824 (2002).

## C.

### Interpretation Of The MSA

The Court of Appeals described the analysis Maryland courts use to interpret contracts in *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 768 A.2d 620 (2001). Judge Rodowsky explained:

The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court. In determining the meaning of contractual language, Maryland courts have long adhered to the principle of the objective interpretation of contracts. Under the objective interpretation principle,

---

settlement agreement that was memorialized in a Consent Order. The Consent Order provided, *inter alia,* that the cross-claims were subject to resolution at trial. The insurance companies, however, were signatories to a previous Arbitration Agreement requiring all disputes between signatory members be submitted to arbitration. One of the insurance companies filed a Motion to Compel Arbitration.

where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court. . . .

Further, "[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.

*Id.* at 250–51, 768 A.2d 620 (citations omitted). When interpreting a specific clause, courts are required to view that clause within the context of the entire agreement so as to avoid negating the effect of other terms in the agreement.

"A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."

*DIRECTV, Inc. v. Mattingly,* 376 Md. 302, 320, 829 A.2d 626 (2003)(quoting *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277 (1964)).

 In this case, our role in reviewing the trial court's order to compel arbitration, like the circuit court's, " 'extends only to a determination of the existence of an arbitration agreement.' " *Stinebaugh,* 374 Md. at 645, 824 A.2d 87 (citations omitted). "The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court." *Wells,* 363 Md. at 250, 768 A.2d 620. Accordingly, we examine the language of the Master Settlement Agreement.

The arbitration clause of the Master Settlement Agreement provides:

It is agreed that the parties will make good faith efforts to resolve **any disputes that may arise while carrying out the terms and conditions of this Agreement.** If the

parties are unable to resolve a dispute, the issue shall be referred to a mutually agreeable arbitrator for binding resolution. If the parties are unable to mutually agree upon an arbitrator, then each party shall select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. All disputes shall then be resolved by a majority vote of the three arbitrators. The decision of the mutually agreeable arbitrator, or of the majority of the three arbitrators, shall be final and binding upon the parties.

MSA ¶ 12 (emphasis added).

The scope of the agreement to arbitrate in Paragraph 12 is broadly defined as "any disputes that may arise while carrying out the terms and conditions of this Agreement." We find this language clear and unambiguous. "[A]ny disputes" clearly includes a dispute over whether joint and several liability applies.

■■■■■■■ "[T]he scope and application of an arbitration clause must be decided on a case-by-case basis, with close attention paid to crafting a resolution that respects the policies underlying arbitration of disputes." *The Redemptorists v. Coulthard Serv., Inc.*, 145 Md.App. 116, 150, 801 A.2d 1104 (2002). In determining the scope of an arbitration clause, the court should resolve any doubts concerning the scope of arbitrable issues in favor of arbitration while respecting the contract nature of arbitration. *See id.* Courts should, therefore, uphold public policy favoring arbitration, but should not force parties to arbitrate absent their agreement to do so. *See id.* at 150–51, 801 A.2d 1104. Careful examination and consideration of the specific facts of each claim is needed before the court can craft a resolution that respects both the public policy favoring arbitration and the parties' agreement to arbitrate. *See id.* at 152, 801 A.2d 1104.

■■■■■■■ Arbitration is contractual in nature; consequently, it must be consensual. *See Stinebaugh*, 374 Md. at 648, 824 A.2d 87. A party, therefore, can only be forced to submit those issues to arbitration it has agreed to submit; and whether there exists an agreement to arbitrate depends on the

intention of the parties. *See id.* Likewise, a party's duty to arbitrate can be discharged by a subsequent agreement. *See id.* Appellants contend that the Rooney letter of October 31, 2000, modified the arbitration clause by granting to appellants the right to bypass arbitration and file an action in circuit court following a breach of M.S.A. payment obligation by CCR members.

We turn to that letter to determine if it modified the parties' agreement to arbitrate the joint and several liability issue. The Rooney letter states, in pertinent part:

> Each settling plaintiff will execute a release to the CCR for the full amount of the settlement prior to receiving the first installment; however, it is specifically understood and agreed that these releases are not evidence of full satisfaction of the contractual obligation of the CCR to pay the qualified plaintiffs the settlement values that have been agreed upon, and should the CCR fail to timely make any or all of the payments required by the Master Settlement Agreement, then in that event **each settling plaintiff who has not received full payment may pursue a remedy in contract against the CCR members for any deficiency.** If such action is required, the CCR members shall be responsible to pay the deficiency with interest at 8% per annum, and the CCR members will reimburse each such settling plaintiff for reasonable attorneys' fees and expenses that may be required to collect this deficiency **by lawsuit or otherwise.**
>
> This remedy in contract on the release will be the **sole legal remedy** of each plaintiff who has executed a release for the full consideration of his settlement but fails to receive timely payment in full, with the exception of those plaintiffs who elect to renunciate the settlement because of the ACMC non-payment before accepting the first settlement installment payment.

Letter from Michael Rooney, Chief Claims Officer, CCR, to William F. Mulroney, Esq., Ashcraft & Gerel, LLP (October 31, 2000)(emphasis added).

The trial court ruled that the terms of the Rooney letter did not negate the arbitration clause. The court recognized that the letter "discusses a remedy," but nevertheless did not find that it "controlled" the forum. An agreement to arbitrate is given important status by statute. "[A] provision in a written contract ... to arbitrat[e] any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." See CJ § 3–206(a). Given that, the court reasoned that the letter should have expressly stated that the remedy in contract on the release constituted an exception to the requirement to arbitrate "any disputes that may arise while carrying out the terms and conditions of this agreement." We agree.

The process set out by which courts ascertain the existence of an agreement to arbitrate is well-established. If the language employed in a written contract is unambiguous, a court should give effect to its plain meaning. *See Wells,* 363 Md. at 251, 768 A.2d 620. Under *Stinebaugh,* however, if the arbitration clause is unclear as to whether the dispute falls within the scope of the arbitration clause, courts are to refer the question of arbitrability to the arbitrator. *See Stinebaugh,* 374 Md. at 643, 824 A.2d 87. "[W]ords in an agreement are ambiguous if they are susceptible of more than one meaning to a reasonable person." *NRT Mid–Atlantic,* 144 Md.App. at 284, 797 A.2d 824 (citing *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999)). We look then to the language of the Rooney letter to determine if it unambiguously modifies the arbitration clause of the MSA.

The Rooney letter provides that "each settling plaintiff ... may pursue a **remedy in contract** against the CCR members for any deficiency." (Emphasis added.) "Remedy" is defined as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." BLACK'S LAW DICTIONARY 1296 (7th ed.1999). The plain language meaning of "remedy in contract" does not express an intention to preclude

arbitration. BLACK's defines "arbitration clause" as "[a] contractual provision mandating arbitration—and thereby avoiding litigation—of disputes about the contracting parties' rights, duties, and liabilities." *Id.* at 100. Clearly, a party can pursue a remedy in court or through arbitration. Remedy is the means of enforcing a right while arbitration is but one forum for such enforcement.

Judicial use of the term "remedy" further illustrates its application to multiple forums. In *Bernhardt v. Polygraphic Co. of Am., Inc.*, 350 U.S. 198, 203, 76 S.Ct. 273, 276, 100 L.Ed. 199 (1956), the Supreme Court equated an arbitration panel and court of law as "tribunals where suits are tried." "For the remedy by arbitration ... substantially affects the cause of action created by the State. The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result." *Id.* In *Goicochea v. Langworthy*, 345 Md. 719, 723, 694 A.2d 474 (1997), the Court of Appeals described the appellee's failure to pursue his special "arbitration remedy," and in *Gilman v. Wheat, First Secs., Inc.*, 345 Md. 361, 382, 692 A.2d 454 (1997), the Court found that a forum selection clause was part of an arbitration clause and should be interpreted in the context of the "arbitration remedy." *See also Stinebaugh*, 374 Md. at 643–44, 824 A.2d 87 (referring to rights and remedies other than arbitration).

Consequently, we find the phrase "remedy in contract" unambiguous and not limiting with respect to the forum for pursuit of a "remedy in contract." The phrase does not exclude arbitration as a forum and, therefore, it does not nullify the M.S.A. arbitration clause.

The Rooney letter's second paragraph ends with the promise that CCR members will pay the expenses and interest accrued if the plaintiffs are "required to collect this deficiency **by lawsuit or otherwise.**" (Emphasis added.) Appellants argue that, in the context of the Rooney letter, "the word 'lawsuit' is diametrically opposed to the word 'arbitration.' "

We disagree. We find use of the word "lawsuit" consistent with an agreement to arbitrate.

In Paragraph 12 of the MSA, the parties unequivocally agreed to arbitrate any disputes that they are unable to resolve informally. This does not foreclose a lawsuit on the issue following arbitration. Maryland arbitration law provides for appeal to the circuit court of an arbitration decision or award. *See* CJ §§ 3–223 to 3–228. The delimiting phrase "or otherwise" adds further support to this interpretation. Consequently, we find that the Rooney letter is unambiguous with regard to the arbitrability of claims against CCR's members for the deficiencies owed by defaulting members.

We are not persuaded otherwise by the holding of the Supreme Court of Virginia in *Amchem*. The Virginia Court analyzed the dispute before it under the Federal Arbitration Act. *See Amchem*, 563 S.E.2d at 743. Like Maryland law, federal law requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). In addition, "**only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.**" *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (emphasis added).

The Virginia Supreme Court inexplicably held that there was no legally cognizable dispute for the parties to arbitrate. It reasoned:

There is no dispute that the language contained in the second paragraph of the October 2000 letter confers upon the plaintiffs the right to "pursue a remedy in contract against the [Center for Claims Resolution] members" for any deficiency in the event the Center for Claims Resolution fails to timely make any payments required by the Master Settlement Agreement. There is no dispute that the Center for Claims Resolution failed to pay the plaintiffs as required by the terms of the Master Settlement Agreement. Additionally, the October 2000 letter explicitly states that this

"remedy in contract on the release will be the sole legal remedy of each plaintiff who has executed a release for the full consideration of his settlement but fails to receive timely payment in full."

The defendants, however, assert that the plaintiffs' contractual remedies are limited to claims against the defaulting members of the Center for Claims Resolution and not "all the members of the Center for Claims Resolution." Thus, the defendants say that this difference in interpretation creates a dispute subject to resolution by an arbitrator pursuant to the terms of the arbitration provision in the Master Settlement Agreement.

Contrary to the defendants' assertions, there can be no legally cognizable dispute regarding the meaning of the clear and unambiguous language contained in the October 2000 letter. . . . [P]ursuant to the plain meaning of the language used in the October 2000 modification, the plaintiffs have the right to "pursue a remedy in contract against the [Center for Claims Resolution] members for any deficiency." This clear and unambiguous language does not limit the plaintiffs' contract remedies to the defaulting Center for Claims Resolution members. We will not add words to the litigants' contract. . . . Moreover, a dispute that subjects a party to arbitration must be real and not imagined. A contrary conclusion would permit a litigant to assert the existence of a purported dispute when there is no basis in fact or law to do so, thereby depriving the opposing litigant of valuable contractual rights.

*Amchem*, 563 S.E.2d at 744–45.

The Court did not separately confront the issue of arbitrability, as we think it should have, but instead blended its analysis of arbitrability with an analysis of the underlying dispute, *i.e.*, whether there was joint and several liability. In holding that the plaintiffs could sue all the "Center for Claims Resolution members," and not just the defaulting member, it resolved the issue in favor of joint and several liability. We consider this holding at odds with federal and Maryland arbitration law.

■ Under the FAA, the court is not to rule on the merits of the underlying dispute. *See AT & T Techs.*, 475 U.S. at 649, 106 S.Ct. at 1419. In *AT & T*, the Supreme Court outlined the courts' role in determining arbitrability under a collective bargaining agreement:

[T]he courts ... have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

*Id.*, 475 U.S. at 650, 106 S.Ct. at 1419 (citations omitted).

■ Maryland law is also clear that a court shall not evaluate the merits of a claim that is subject to arbitration. The MUAA provides that "[a]n order for arbitration shall not be refused ... [o]n the ground that the claim in issue lacks merit or bona fides." CJ § 3–210. Consistent with section 3–210 is section 3–224, providing that, after arbitration, a court "shall not vacate the award or refuse to confirm the award on the ground that a court of law or equity could not or would not grant the same relief." *See also Southern Md. Hosp. Ctr. v. Edward M. Crough, Inc.*, 48 Md.App. 401, 427 A.2d 1051, *cert. denied*, 290 Md. 721 (1981)("mere error in the laws or failure on the part of arbitrators to understand or apply the law will not justify judicial intervention"); *O–S Corp. v. Samuel A. Kroll, Inc.*, 29 Md.App. 406, 348 A.2d 870, (1975), *cert. denied*, 277 Md. 740 ("when reviewing the fruits of an arbitrator's award, a judge may withhold only such as were tainted by improbity *or* based on a completely irrational interpretation of the contract").

■ Under *Stinebaugh*, our role is to determine if the subject matter of the dispute falls within the scope of the arbitration clause, bearing in mind that arbitration should be compelled if the arbitration clause is broad and does not "expressly and explicitly exclude" the dispute. *See Stinebaugh*, 374 Md. at 643, 824 A.2d 87. We hold that the

arbitration clause in the M.S.A. is clear, unambiguous, and its scope encompasses this dispute over joint and several liability of CCR members.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**