COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Fulton, Callins and Senior Judge Humphreys
Argued by videoconference


JIMIJOE D. SALSMAN, SOMETIMES KNOWN AS
 JIM SALSMAN, ET AL.

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1811-24-3                    JUDGE JUNIUS P. FULTON, III
                                                      SEPTEMBER 23, 2025
BETTY C. AARON


                    FROM THE CIRCUIT COURT OF BOTETOURT COUNTY
                                Joel R. Branscom, Judge

                 Wilson C. Pasley (Wilson C. Pasley, PLC – Attorney at Law, on
                 briefs), for appellants.

                 No brief or argument for appellee.[1]


        Jimijoe Salsman and Andrea Kennedy (hereinafter "the Salsmans") entered into a lease to

own agreement with Betty and Raymond Aaron (hereinafter "the Aarons") in 2016 to purchase real

property.  Due to a disagreement over the terms of the agreement, the Salsmans sued Betty Aaron[2]

(hereinafter "Betty") for reformation, specific performance, and damages.  Betty filed a

counterclaim also seeking reformation, specific performance, and damages.  Both alleged mutual

mistake of fact, albeit under different theories.  After a bench trial, the trial judge ruled in favor of

Betty, granting her reformation and specific performance.  On appeal, the Salsmans challenge the

trial court's rulings that (1) there was a mutual mistake of fact as to the acreage of Parcel II, (2) that

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

        [1] Appellee filed her brief late, and thus we cannot consider it nor was she entitled to oral
argument.

        [2] Raymond Aaron passed away in 2020, prior to this litigation.

a survey of Parcel II obtained by Betty Aaron is more accurate than a survey obtained by the Salsmans, and (3) that the lease to own agreement is to be enforced and the resulting deed would be attached with Betty's survey rather than the Salsmans' survey. Finding no error, we affirm the rulings of the trial court.

BACKGROUND[3]

On August 21, 2016, the Salsmans and the Aarons entered into a lease to own agreement (the "Agreement"). The Salsmans agreed to pay an initial sum of $14,600 and then monthly installments of $800 for 62 months for a total of $64,200 to the Aarons in exchange for real property described in the Agreement as:

> [L]andlord is the owner of land and improvements commonly known and numbered as 135 Huffman Rd, Eagle Rock, VA, 24085 and legally described as follows: The 3 acre lot and 2 story home located in Botetourt County, VA identified as parcel 18103 and on Tax Map 8 27A(1)46A, also being the same property conveyed to Landlord by the Walter L. Huffman Estate on March, 23, 2009. Hereafter referred to as "Leased Premises."

The deed from the Walter L. Huffman Estate that had previously transferred the real property to the Aarons describes it as two separate parcels. "Parcel II" was described as:

> [S]urveyed for Walter Finney and others, Heirs of Sarah E. Finney deceased 3 acres of land sold to C. W. Woltz. The land lying in the County of Botetourt, on the N. side of the James River adjoining the town of Eagle Rock and is bounded as follows, to wit: Beginning at a Stake at a and runneth thence, S 111 W 32 feet at a point (at a) S 34 E 60 feet to a stake (at c) thence with a road or Street, S 79 E 32 feet to a Stake (at d) N 67 E 280 feet to a Stake at 3, N 56 E 570 feet to a Stone, at 4, thence leaving the road, N 34 W 195 feet to a Stake, at 5, on the E side of another proposed road and thence with the same S 54 W 845 feet to the beginning at a. June 17, 1907. C. W. Switzer Sur. Botetourt County . . . .

---

[3] "Under the applicable standard of review, we view the evidence in the light most favorable to [Betty] as the party who prevailed below." *Bennett v. Commonwealth*, 69 Va. App. 475, 479 n.1 (2018) (citing *Riner v. Commonwealth*, 268 Va. 296, 303, 327 (2004)).

In compliance with the Agreement, the Salsmans made the initial and monthly payments to the Aarons, as well as the utility and tax bills associated with the property. By October 2021, all required payments had been made by the Salsmans to the Aarons.

On October 21, 2021, the day before Betty was meant to transfer the deed to the Salsmans, the Salsmans received a letter from Betty containing a new proposed deed and survey. The new survey asserted that Parcel II was actually 2.681 acres, and the proposed deed incorporated the new survey (hereinafter "Betty's survey"). The Salsmans did not accept the proposed deed given its discrepancy with the current deed and prior surveys.

On January 5, 2022, the Salsmans filed a complaint against Betty seeking reformation and specific performance of the agreement and damages. They alleged that in their discussions with the Aarons, prior to the creation of the Agreement, the parties agreed that both "Parcel II" and "Parcel I" would be encompassed in their Agreement. The Salsmans also argued that due to the parties' reliance on the county website—which showed Tax Map ID No. 27A(1)46A as applying to both Parcel I and II—the parties had assumed, mistakenly, that this Tax Map ID number applied to both parcels. Thus, they asserted that the parties made a mutual mistake of fact in describing the property subject to their agreement.[4]

---

[4] Specifically, the Salsmans asserted that reformation of the Agreement was appropriate to reflect not only the parties' intent to convey both parcels, but that the total acreage of property subject to the Agreement was 4 5/8 acres. The Salsmans sought reformation to state:

> that the real property that the Salsmans would be leasing and ultimately purchasing from Raymond and Betty is "Tax Map Numbers 27A(1)46A and 27A(1)41 & 42," "parcels 18103 and 18098," and a "lot of 4 5/8 acres, more or less" (rather than merely "Tax Map 27A(1)46A," "parcel 18103," and a "acre lot").

However, the trial court ruled that the Agreement only included Parcel II, and the Salsmans do not challenge this on appeal. Therefore, these facts and analysis will focus on Parcel II.

Betty answered and counterclaimed also seeking reformation and specific performance of the Agreement and damages. They denied that there was any agreement to convey Parcel I and alleged that only one parcel, Parcel II, was encompassed by the Agreement. They also asserted that the parties had made a mutual mistake, but only concerning the acreage of Parcel II. Betty also asked the trial court to "reform the Contract so that it more accurately describes the size of the lot in question[, Parcel II,] as 2.681 acres." The Salsmans demurred to the counterclaim, arguing that the chain of title and the Agreement both indicated that Parcel II was three acres, and therefore Betty was estopped from claiming that the acreage was less than three acres. The trial court overruled the demurrer.

At trial, both parties presented evidence from land survey experts regarding the accuracy of the original 1908 survey and their respective conclusions in completing their competing surveys. There was no objection from either party as to both experts' qualifications, and the Salsmans' expert even agreed with the methodology utilized by Betty's expert. Both experts agreed that the original 1908 survey that indicated that Parcel II was three acres was mathematically incorrect.[5] However, the experts disagreed as to the actual acreage of Parcel II. The Salsmans' expert asserted it was 3.372 acres, and Betty's expert said it was 2.681 acres. However, despite agreeing that the original 1908 survey was incorrect, the Salsmans argued that Betty was estopped from asserting a survey that was in derogation of the title she had received and that Betty's survey indicating that Parcel II was actually less than three acres amounted to a derogation of her own title.

On October 29, 2024, after a bench trial, the trial court ruled that the Agreement unambiguously designated only Parcel II as the property to be conveyed and rejected the

_____

[5] Specifically, when mapping out the property borders as drawn on the original survey, both experts found that the property lines did not meet.

- 4 -

Salsmans' assertion that the Agreement included Parcel I.  Additionally, the trial court agreed that there had been a mutual mistake of fact, but only as to the acreage of Parcel II.  Finally, the trial court determined that Betty's survey would be attached to the deed of conveyance to the Salsmans as it is the more accurate survey of the actual acreage of the parcel.  The Salsmans appealed.

ANALYSIS

When interpreting a contract, in this case the Agreement, this Court will do so de novo. *See PMA Capital Ins. Co. v. US Airways, Inc.*, 271 Va. 352, 357-58 (2006).  This Court will review the trial court's decision to overrule the demurrer under a de novo standard, but we do note that the Salsmans' claims of estoppel and constructive notice effectively constitute a plea in bar.  *See Lewis-Gale Med. Ctr., LLC v. Alldredge*, 282 Va. 141, 147 n.1 (2011).  Thus, we will assume the facts stated in the complaint are true.  *See Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019).  The parties disagree as to what standard of review this Court should adopt to examine the trial court's finding that Betty's survey is more accurate than the Salsmans' survey.  Because the trial court determined that there was a mutual mistake of fact as to the acreage of Parcel II and consideration of a demurrer requires both the trial court and this Court to make any factual inferences in favor of the non-movant (here, Betty), the trial court's determination regarding the accuracy of the surveys was one of fact.  Therefore, we will review that decision under an abuse of discretion standard.  *See Tidewater Psychiatric Inst. v. City of Va. Beach*, 256 Va. 136, 141 (1998) ("In these respects, the issue was presented to the trial court as a 'battle of experts,' and we will defer to the judgment of weight and credibility given to the testimony of the experts by the trial court . . . . ").

The Salsmans bring five assignments of error which we address in three parts.

A.  Mutual Mistake of Fact and Estoppel

The Salsmans challenge the trial court's finding of a mutual mistake of fact regarding the acreage of Parcel II, arguing that the chain of title as well as the parties' constructive notice prevent the trial court from ordering specific performance of the contract in accordance with Betty's survey under various doctrines of estoppel.  We disagree.

First, we address the trial court's determination that the parties made a mutual mistake as to the acreage of property to be conveyed.  The legal descriptions contained in the previous chain of title and Agreement all describe Parcel II as three acres, while Betty's survey describes the property as 2.681 acres and the Salsmans' survey describes the property as 3.372 acres.  "[A] mutual mistake of the parties in a matter which is part of the essence of the contract and substance of the thing contracted for, will be corrected by a court of equity."  *Leas' Ex'or v. Eidson*, 50 Va. (9 Gratt.) 277, 278 (1852).  However, in the context of mutual mistakes of fact, "[w]here the court is unable, from all the circumstances of the case, to say whether the minds of the parties met upon all the essential particulars, . . . , or trace out any practical line where their minds met, specific performance will be refused."  *Clinchfield Coal Co. v. Powers*, 107 Va. 393, 398-99 (1907) (quoting from *Blanchard v. Detroit, L. & L.M.R. Co.*, 31 Mich. 43, 53 (1875)).

Here, there is no doubt that there was a mutual mistake of fact as to the acreage of property contained in Parcel II.  Both parties' land survey experts testified that the original survey was mathematically incorrect.  The acreage of the property (Parcel II alone) certainly goes to the "essence of the contract and substance of the thing contracted for" and thus the trial court was correct when it found that a mutual mistake of fact existed in the execution of the Agreement.  Additionally, there was no dispute as to the trial court's decision to order specific

performance—both parties sought specific performance, and the only disagreement was which of the competing theories of mutual mistake of fact should be accepted by the trial court.[6]

In response, the Salsmans challenge the trial court's acceptance of Betty's survey, reasoning that Betty's assertions are in derogation of her title—in other words, the chain of title and Agreement indicate that Parcel II is three acres, and thus Betty is estopped from now claiming that Parcel II is actually less than three acres even if there was a mutual mistake of fact as to the acreage of the property. We disagree.

In our review of the relevant caselaw, there is significant overlap in the application of the various theories of estoppel that the Salsmans appear to assert, namely estoppel by deed, estoppel to deny title, and judicial estoppel. *See, e.g.*, *Marshall v. Jameson*, 145 Va. 605, 610-11 (1926) ("The rule is well established that where the deed recites or affirms, expressly or impliedly, that the grantor is seized of a particular estate which the deed purports to convey, and upon the faith of which the bargain was made, he will be thereafter estopped to deny that such an estate was passed to this vendee, although the deed contains no covenant of warranty at all. And the rule accords with common honesty and fair dealing."); *Reynolds v. Cook*, 83 Va. 817, 822-23 (1887) ("The principle deducible from these authorities seems to be, that whatever may be the form or nature of the conveyance used to pass real property, if the grantor sets forth on the face of the instrument, by way of recital or averment, that he is seised or possessed of a particular estate in the premises, and which estate the deed purports to convey; or, what is the same thing, if the seisin or possession of a particular estate is affirmed in the deed, either in express terms or by necessary implication, the grantor and all persons in privity with him shall be estopped from ever

---

[6] The Salsmans did not assign error to the trial court's decision to order specific performance, but only argue that specific performance should have been ordered in accordance with their preferred terms. During oral argument, counsel for the Salsmans conceded as much. Consequently, we do not reach the trial court's decision to order specific performance after reforming the Agreement.

afterwards denying that he was so seised and possessed at the time he made the conveyance. The estoppel works upon the estate and binds an after-acquired title as between parties and privies."); *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 278 Va. 444, 473 (2009) ("[J]udicial estoppel forbids parties from assuming successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory."). Each of these principles emphasizes the same underlying premise: a party may not approbate and then reprobate.

To begin with, "[t]he estoppel of a deed will be limited to suits based upon it or growing out of the transaction in which it was executed, and will not extend to a collateral action, where the cause is different, although the subject matter may be the same." *McCullough v. Dashiell*, 78 Va. 634, 641 (1884). The suit at issue is not "based upon the deed or growing out of a transaction in which it was executed" but instead is a collateral action, because the deed in question here was only a "proposed" deed. Thus, under *McCullough*, estoppel by deed does not apply.

Further, no theory of estoppel applies in this case because Betty is not asserting anything that is in derogation of her title. In Virginia, title refers to the ownership of property and any interests in that property. *See Title*, *Black's Law Dictionary* (11th ed. 2019) ("The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property."). Derogation of that title could manifest as a lien or encumbrance on the property or interests in that property. Here, the trial court found that there was a mutual mistake of fact as to the acreage of property contained in Parcel II, resulting in its acreage being less than what was previously thought. This finding does not affect Betty's title, or the property rights the Aarons contracted to convey to the Salsmans. To put it another way, Betty is not asserting anything contrary to the title (namely the rights in the real property) the Aarons received from

- 8 -

the Huffman Estate. By accepting Betty's survey, the trial court is merely correcting a mistake in Betty's deed which described the property such that Betty may transfer a title with an accurate description to the Salsmans. The Salsmans appear to be conflating the rights in property—colloquially known as the "bundle of sticks"—with the *quantity or acreage* of property in which those rights may be exercised. Any reduction in the "bundle of sticks" or rights would constitute a derogation of title. Betty's assertion of a mutual mistake as to the acreage of the property does not affect the rights to be conveyed, and thus, estoppel does not apply.

To support their argument that estoppel bars the trial court from accepting Betty's survey, the Salsmans cite to *Nishanian v. Sirohi*, 243 Va. 337 (1992), and *Johnson v. Powhatan Mining Co.*, 127 Va. 352 (1920). In *Nishanian*, the Salsmans specifically point to the statement "[i]t is axiomatic that one who claims an interest in property is estopped to deny the title of his predecessors in interest." 243 Va. at 340. As we have already stated, Betty is not asserting anything in derogation of their title, and thus *Nishanian*'s estoppel theory does not apply here. In *Johnson*, the Salsmans point to the statement "'[a] person cannot claim under an instrument without confirming it' but rather 'must found his claim on the whole and cannot adopt that feature or operation which makes in his favor, and at the same time repudiate or contradict another which is counter or adverse to it.'" 127 Va. at 363. Once again, this theory does not apply. By accepting Betty's survey, the trial court has not made any change to the title which Betty possesses and agreed to transfer to the Salsmans. The Salsmans appear to argue that the trial court's actions have resulted in them getting less than what they bargained for. While there may have been an opportunity for relief in this regard, either through abatement or even rescission of the Agreement, the Salsmans did not seek this relief.

The Salsmans make a related and equally unavailing argument that constructive notice should bar Betty's claim. "[T]he recordation of an instrument gives constructive notice of all the

facts expressly stated in the instrument and other matters therein suggested which might be disclosed upon prudent inquiry." *Chavis v. Gibbs*, 198 Va. 379, 382 (1956). The Salsmans argue that when the Agreement was executed, they and the Aarons "were on constructive notice of the Deed's contents . . . at the time that each of them signed" and that this constructive notice means that "none of them can plausibly claim that they were 'mistaken' when they decided to make an agreement . . . ."

While we agree with the principle, we disagree with the Salsmans' argument as to its application in this case. Certainly, both parties were on notice that Parcel II reportedly consisted of three acres. The essential nature of a mutual mistake of fact is that neither party is aware of the mistake before the contract is entered into. *See Burton v. Haden*, 108 Va. 51, 56-57 (1908) ("[I]f parties contract under a mutual mistake and misapprehension as to their relative and respective rights, the result is that that agreement is liable to be set aside as having proceeded upon a common mistake."). There is no dispute that neither party knew that the original 1908 survey was inaccurate when the Agreement was signed. The Salsmans appear to ask this Court to accept and enforce an inaccuracy—an assertion confirmed to be inaccurate by both parties and then confirmed by the trial court—as superior to an accurate assertion, simply because it was in the deed. If the trial court had not found a mutual mistake of fact as to the acreage of Parcel II, the Salsmans' argument might have more weight. However, here, the trial court found that both parties, with no allegations of fraud, were mistaken as to the acreage of Parcel II when they executed the Agreement. Finding the Salsmans' argument to be unavailing, we conclude that the correction of such a mistake does not amount to a violation of constructive notice or estoppel principles.

- 10 -

Consequently, the trial court did not err in ordering specific performance of the Agreement with Betty's survey because there was no derogation of title and the Salsmans' constructive notice argument is without merit.

### B. Referencing Tax Map No. 27A(1)46A

The Salsmans argue that the trial court erred when it ruled that the Agreement "unambiguously restricts the real property being conveyed to Tax Map Parcel ID 27A(1)46A in accordance with the Botetourt County tax map records." The Salsmans argue that "contracts are construed as written, without adding terms that were not included by the parties." *Amchem Prods., Inc. v. Newport News Cir. Ct. Asbestos Cases Pls.*, 264 Va. 89, 98 (2002) (quoting *TM Delmarva Power v. NCP of Va.*, 263 Va. 116, 119 (2002)). Thus, they claim that this ruling amounted to the trial court impermissibly considering documents that were outside the bounds of the Agreement. We disagree.

When considering the above statement in the context of the *entire* final order issued by the trial court, it is clear that the trial court utilized the Tax Map ID number as a means of identifying Parcel II vs. Parcel I.[7] At trial, the transfer of one or both parcels was in dispute, and thus the trial court made very clear in its order that the only parcel to be conveyed under the Agreement was Parcel II. Thus, we reject the Salsmans' argument that by referencing the Tax Map ID number the trial court was impermissibly considering documents outside of the bounds of the Agreement.[8]

---

[7] As mentioned previously, the parties originally disputed which parcels of land were included in the Agreement. At trial, the judge referred to the parcels not by "Parcel I" and "Parcel II" as we do here, but by their Tax Map ID Numbers. Parcel I is designated with Tax Map ID Number 27A(1)41&42 and Parcel II with Tax Map ID Number 27A(1)46A.

[8] Additionally, the Tax Map ID number was listed in the Agreement as a means of identifying and distinguishing the two separate parcels of land.

C.  Betty's Survey vs. the Salsmans' Survey

Finally, the Salsmans challenge the trial court's finding that Betty's survey was more accurate than the Salsmans' survey.  In making this decision, the trial court heard testimony from land survey experts offered by the Salsmans and by Betty.  The parties stipulated to both experts' qualifications, and their testimony concerning their respective surveys was accepted by the trial court as based on a reasonable degree of professional certainty.

The trial court heard ample testimony from each expert as to their methodology and process for developing their surveys.[9]  Both experts agreed that the original 1908 survey of Parcel II was inaccurate, though they disagreed as to how the issue should be corrected. The conclusion reached by the Salsmans' expert resulted in Parcel II retaining the general shape of the property as depicted in the original survey, which resulted in parts of Parcel II overlapping with other adjacent properties.[10]  The conclusion reached by Betty's expert modified the outline of the property, avoiding any overlap with adjacent properties.

After considering the evidence and testimony from both experts, the trial court concluded that Betty's expert's methodology and resulting survey were more accurate, noting, for example, that Betty's expert actually visited Parcel II in person, whereas the Salsmans' expert did not.  We find that the trial court was confronted with a classic "battle of the experts" and thus was tasked

---

[9] As an example, in reaching their respective conclusions, both experts testified about their consideration of monuments such as iron pins discovered during the surveys and adjacent boundary lines, which is consistent with the preferred method of resolving inconsistencies in the description of real property. *See Spainhour v. B. Aubrey Huffman & Assoc., Ltd.*, 237 Va. 340, 346-47 (1989) ("In the absence of evidence of contrary intent, a distinct order of preference governs inconsistencies in the description of land: 1. natural monuments or landmarks; 2. artificial monuments and established lines, marked or surveyed; 3. adjacent boundaries or lines of adjoining tracts; 4. calls for courses and distances; [and] 5. designation of quantity.").

[10] The obvious implication of which is that the owners of adjacent properties, who were not parties to the litigation, would be negatively affected had this survey been adopted by the trial court.

with making a factual determination as to which expert's survey was to be adopted. In our review of the record, there is evidence and testimony that supports the trial court's determination that Betty's survey was more accurate than the Salsmans' survey and thus we do not disturb it on appeal. *See Tidewater Psychiatric Inst.*, 256 Va. at 141.

The Salsmans also argue that the trial court should not have accepted Betty's survey because her expert "failed to consider that the deed for the property is the senior deed" and that he improperly relied on the 1997 survey and tax maps rather than the deed. This argument appears to ignore the fact that the Salsmans' expert explicitly agreed with the methodology employed by Betty's expert in creating Betty's survey. In essence, the Salsmans argue that the Huffman deed, which described the land as three acres, should rule over any tax maps or subsequent surveys that indicate otherwise as to its acreage and that it was an error to rely on anything other than the original deed.

While the Salsmans state the rule correctly, the trial court did not err in accepting Betty's survey because the trial court found that there had been a mutual mistake of fact as to the acreage of Parcel II—in other words, the Huffman deed, which the Salsmans argue should overrule any of the subsequent surveys or tax maps, was undisputedly determined to be mathematically inaccurate. As such, the trial court was charged with the responsibility to reform the deed of conveyance from Betty to the Salsmans consistent with the survey which the court found to be more accurate, which in this case was Betty's survey. *See Charles v. Charles*, 127 Va. 604, 610 (1920) ("There is no doubt about the jurisdiction of a court of equity to reform an instrument so as to make it speak the real agreement of the parties where, because of mutual mistake, it fails to do so, but the evidence of such mistake must be clear, convincing and satisfactory.").

CONCLUSION

In sum, we conclude that there was sufficient clear and convincing evidence to support the trial court's finding of the theory of mutual mistake as asserted by Betty and properly ordered that Betty's survey be attached with the deed to be recorded consummating the Agreement. For the foregoing reasons, we affirm the rulings of the trial court.

*Affirmed.*